UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                              :
ANNA RITA DURANTE            :
                              :
v.                            : CIV. NO. 3:13CV1298(HBF)
                              :
CAROLYN W. COLVIN, ACTING    :
COMMISSIONER, SOCIAL SECURITY :
ADMINISTRATION               :
                              :
```

## RECOMMENDED RULING ON CROSS MOTIONS

Plaintiff Anna Rita Durante brings this action pursuant to 42 U.S.C. §405(g), seeking review of a final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §401 et seq. Plaintiff has moved to reverse the Commissioner's decision.

For the reasons set forth below, plaintiff's Motion for Order Reversing the Decision of the Commissioner [**Doc. #11**] is **DENIED.** Defendant's Motion for an Order Affirming the Decision of the Commissioner [**Doc. #12]** is **GRANTED.**

## I.   ADMINISTRATIVE PROCEEDINGS

The procedural history of this case is not disputed. Plaintiff filed an application for DIB on May 9, 2011, alleging disability as of January 1, 2011, with a date last insured of December 31, 2011. [Certified Transcript of the Record, Compiled on October 22, 2013, (hereinafter "Tr.") 139-40]. Her claim was

denied initially and upon reconsideration [Tr. 77-80, 83, 84-86].
Plaintiff requested a timely hearing before an ALJ on October 24,
2011. [Tr. 87].  On May 2, 2012, Administrative Law Judge Amita
B. Tracy held a hearing at which plaintiff appeared with counsel.
[Tr. 80, 25-51; 80-81]. Vocational Expert ("VE") Albert J.
Sabella testified at the hearing. [Tr. 41-48].  On May 16, 2012,
the ALJ found that plaintiff was not disabled, and denied her
claims. [Tr. 10-23].  Plaintiff filed a timely request for review
of the hearing decision on June 13, 2012. [Tr. 6]. On July 2,
2013, the Appeals Council denied review, thereby rendering ALJ
Dolan's decision the final decision of the Commissioner. [Tr. 1-
3]. The case is now ripe for review under 42 U.S.C. §405(g).

　　　Plaintiff, represented by counsel, timely filed this action
for review and moves to reverse the Commissioner's decision.

## II. STANDARD OF REVIEW

　　　The scope of review of a social security disability
determination involves two levels of inquiry. The court must
first decide whether the Commissioner applied the correct legal
principles in making the determination. Next, the court must
decide whether the determination is supported by substantial
evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).
Substantial evidence is evidence that a reasonable mind would
accept as adequate to support a conclusion; it is more than a
"mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401
(1971); Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998). The
substantial evidence rule also applies to inferences and

conclusions that are drawn from findings of fact. Gonzales v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977). The court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993). The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. In reviewing an ALJ's decision, the court considers the entire administrative record. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). The court's responsibility is to ensure that a claim has been fairly evaluated. Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold the ALJ's decision "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1987). To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors in any determination with sufficient specificity. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). Thus, although the ALJ is free to accept or reject the testimony of any witness, a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible review of the record. Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988).

Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding. Peoples v. Shalala, No. 92 CV 4113, 1994 WL 621922, at *4 (N.D. Ill. 1994); see generally Ferraris, 728 F.2d at 587.

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. §423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The SSA has promulgated regulations prescribing a five step analysis for evaluating disability claims. In essence, if the Commissioner determines "(1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); see also Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); 20 C.F.R. §§404.1520(b-f), 416.920(b-f).

The burden of proving initial entitlement to disability benefits is on the claimant. Aubeuf v. Schweiker, 649 F.2d 107,

4

111 (2d Cir. 1981). The claimant satisfies this burden by showing that an impairment prevents return to prior employment. Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983). The burden then shifts to the Commissioner, who must show that the claimant is capable of performing another job that exists in substantial numbers in the national economy. 20 C.F.R. §§404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

### III. VOCATIONAL PROFILE

Plaintiff was born on April 15, 1963, and claims an onset of disability as of January 1, 2011. [Tr. 28]. Plaintiff has a high school education and completed a certificate program at a cosmetology school after graduation. [Tr. 30]. Plaintiff testified she owns her own hairdressing salon and, [tr. 31] since her onset date, she has worked as a hairdresser four to five hours per day, four days a week, [tr. 30, 169], including some bookkeeping for the business, in addition to her daytime working hours [Tr. 32].

Medical records dated March 2007, and March and May 2011, identified her employment as "Hairstylist and restaurant owner." [Tr. 371, 300, 297]. Plaintiff reported she was working full time in June 2011. [Tr. 336].

Plaintiff was insured for the DIB Title II program through December 31, 2011. [Tr. 12].

**IV. Medical History**

A.        *Medical Records*

    **1.    MRI-Cervical Spine**

A MRI-Cervical Spine report dated January 14, 2010, states,

> Examination is limited by metallic artifact from
> fusion hardware. Anterior fusion is noted from C4
> to C7, with posterior decompression the
> craniocervical junction and C2-C3 levels appear
> unremarkable. At C3-C4 there is bilateral
> uncovertebral spurring and facet hypertrophy with
> moderate narrowing of the neural foramina. The
> assessment of the neural foramina is somewhat more
> limited at the levels of fusion but there is no
> significant narrowing noted at C4-C5.  At C5-C6
> there is narrowing of the right neural foramen
> secondary to uncovertebral hypertrophy. Also noted
> at this level is posterior ossesous protrusion
> with impression on the ventral aspect of the cord
> but without actual canal stenosis. At C6-C7 and
> C7-T1 the neural foramina appear patent.
>
> Impression: Status post anterior fusion C4-C7.
> Uncovertebral arthropathy C3-C4 and C5-C6 right-
> sided, the latter correlate with possible right-
> sided radiculopathy (C6) due to osseous spurring.

[Tr. 241].

    **2.    X-Ray Chest Two Views**

An x-ray taken on January 4, 2010, "demonstrate normal

cardiac silhouette. The lungs are clear. There is no definite

fracture or pneumothorax. Partial visualization of lower cervical

spinal fusion. Severe thoracic dextroscoliosis is unchanged."

[Tr. 243].

### 3.   Full Body Bone Scan

A Full Body Bone Scan was performed on January 13, 2010, noting a clinical history of bone pain, sternal pain and breast carcinoma. [Tr. 242-43]. Comparison: CT chest abdomen pelvis 1/4/2010.[1]

> Findings: Planar images demonstrate renal and soft tissue uptake to be normal.
>
> Degenerative time uptake in L3, L4 and L5 vertebral bodies scoliosis in the lumbar spine with convexity towards the left and in the thoracic spine towards the right.
>
> Mild degenerative uptake in bilateral shoulder joints and hip joints.  No intense uptake to suggest of any acute traumatic finding or metastatic disease.
>
> Impression: degenerative type of uptake in the right lumbar spine. No osteoblastic metastatic disease or trauma.

[Tr. 242].

### 4.   Radiograph and MRI Lumbrosacral Spine/Lumbar Spine

A MRI of plaintiff's Lumbrosacral Spine was taken on March

---

1 The CAT Scan Report of plaintiff's abdomen and pelvis from January 4, 2010, is included in the medical records. Indication: Back pain. Question of aortic disease.  With regard to plaintiff's back, the report states, "25 degrees of lumbar levoscoliosis is measured from L1 through L5. At L2-L3, there is irregular, predominantly right sided narrowing of disc space with endplate sclerosis and osteophytosis. No acute fracture." [Tr. 244-46].  "Conclusion: Thoracic dextroscoliosis and lumbar levoscoliosis. Degenerative disc disease, predominantly right-sided at L2-L3." [Tr. 246].

21, 2007, noting a history of back pain with right side

radiculopathy. [Tr. 303-04].

> Findings: There is a scoliosis convex to the left
> side. The distal spinal cord is grossly normal.
> There is marked narrowing with spurring at the L2-
> L3 interspace and endplate signal changes
> compatible with degenerative change. There is mild
> compression of the anterior CSF at this level
> related to a spall spur. There is some facet
> hypertrophy on the right side. There is no
> evidence for herniated disc. I do not see any
> significant neural foraminal encroachment. The
> spinal canal is widely  patent. The paraspinal
> soft tissues are normal.

> Conclusion: there is scoliosis.  There is
> degenerative change at L2-L3 with narrowing of the
> interspace, spurring and right-sided facet
> hypertrophy. There is no herniated disc.

[Tr. 303-04].

A radiograph of plaintiff's lumbrosacral spine AP and LAT dated

July 15, 2009, compared findings from an earlier x-ray dated

August 7, 2009. [Tr. 335].

> Findings: there is a severe dextroscoliosis of the
> mid thoracic spine with a compensatory
> levoscoliosis of the mid lumbar spine. There is
> also a rotary component. Curvature limits
> evaluation on the lateral view, though there does
> not appear to be any vertebral body subluxation.
> There is severe disc space narrowing at L2-L3,
> greater on the right side along the inner
> curvature of the scoliosis. Prominent
> anterolateral osteophytes are also noted at this
> level. There may be minimal disc space narrowing
> at L1-L2, also greater towards the right side.
> Bone mineralization is normal. Overall appearance
> is similar to the prior exam.

> Impression: stable exam.

[Tr. 335].

A MRI-Lumbrosacral Spine was taken "status post fall, pain" on August 7, 2010.

> Findings: There is moderate levoscoliosis of the lumbar spine. Five non rib bearing lumbar vertebral bodies are seen. The vertebral body heights are maintained. There is moderate degenerative disc disease seen at L2-L3 level with osteophytosis and endplate sclerosis with decreased disc space. No evidence of spondylosysis. No abnormal prevertebral or paravertebral soft tissue opacities are identified. On the lateral projection, no acute displaced fracture of the sacrum is seen. However, the frontal projection is markedly limited to overlying bowel frontal projection is markedly limited due to overlying bowel gas. Bilateral sacroiliac joins are grossly unremarkable.
>
> Impression: Limited evaluation of the sacrum as described. No radiographic evidence of acute displaced fracture seen in the remaining osseous structures.  If relevant, a bone scan or an MRI can be considered to exclude a nondisplaced fracture.[2]

[Tr. 258].

A MRI-Lumbar Spine report dated December 20, 2010, compared findings from an earlier MRI dated March 21, 2007.  [Tr. 218].

> Findings: Levoscoliosis again noted. Vertebral body height and alignment are otherwise normal. The conus medullaris is normal. Loss of disc space height and T2 signal as well as degenerative endplate changes mild spurring at L2-L3 worse on the right compatible with advanced degenerative disc disease.  Some evolution of degenerative

---

2 A radiograph of the pelvis from August 7, 2009, shows no acute displaced fracture. [Tr. 259].

endplate changes compared to prior study. Mild
disc desiccation also noted at L1-L2. There is no
significant canal stenosis, neural foramen
stenosis, or disc herniation. Mild left-sided
facet arthropathy at L5-S1 again noted.

Impression: 1. Levoscoliosis and advanced
degenerative disease at L2-L3, worse on the right
as described above. 2. Mild disc desiccation at
L1-L2. 3. Mild left-sided facet arthropathy at L5-
S1.

[Tr. 218].

A radiograph of the lumbrosacral spine AP and Lat was taken

on July 15, 2011, noting a history of right-sided back pain and

tenderness. "Comparison: Lumbar spine x-rays, 8/7/2009."  [Tr.

262].

Findings: There is a severe dextroscoliosis of the
mid thoracic spine with compensatory levoscoliosis
of the mid lumbar spine.  There is also a rotatory
component. Curvature limits evaluation on the
lateral view, though there does not appear to be
any vertebral body subluxation. There is severe
disc space narrowing at L2-L3, greater on the
right side along the inner curvature of the
scoliosis. Prominent anterolateral osteophytes are
also noted at this level. There may be minimal
disc space narrowing at L1-L2, also greater
towards the right side. Bone mineralization is
normal. Overall appearance is similar to the prior
exam. Impression: stable exam.

[Tr. 262].

A MRI of plaintiff's lumbrosacral spine was taken

on November 14, 2011 "Comparison: lumbar spin MRI,

12/20/2010." . [Tr. 415-16].

Findings: There is a prominent levoscoliosis of
the upper lumbar spine. There is also

straightening of the normal lumbar lordosis. There
is no evidence of vertebral body subluxation.
Vertebral body heights are preserved. There is
mild disc space narrowing at L1-L2 and severe disc
space narrowing at L2-L3, greater on the right
along the inner convexity of the scoliosis.
Prominent Modic Type II degenerative changes are
seen at L2-L3 on the right as well. Marrow signal
is otherwise homogenous. The conus ends at mid L1.

At L1-L2 there is a minimal right paracentral disc
bulge without significant central canal stenosis.
There is no significant neural foraminal stenosis.

At L2-L3 there is minimal broad based disc
osteophyte without significant central canal
stenosis. There may be minimal facet spurring with
trace fluid in the left facet joint, though there
is no evidence of neural foraminal compromise.

At L3-L4 and L4-L5 there is a minimal diffuse disc
bulge without significant canal stenosis. There
may be mild facet hypertrophy though there is no
significant neural foraminal stenosis.

At L5-S1 there is no significant disc bulge or
canal stenosis. There is bilateral facet spurring
without significant neural foraminal compromise.

The visualized retroperiotoneal soft tissues are
unremarkable.

IMPRESSION: Stable levoscoliosis with advanced
degenerative disease at Le-L3, worse on the right
along the inner convexity of scoliosis.  Mild
degenerative disc disease at L1-L2, unchanged.
Mild multilevel facet degenerative change without
significant neural foraminal compromise.

[Tr. 415-16].

 An X-ray of plaintiff's "Scoliosis Thoracolumbar
Standing" was taken on March 27, 2012. [Tr. 444-45]. No
prior studies were available for comparison. [Tr. 444].

11

Findings: The patient is status post ACDF
[Anterior Cervical Discectomy and Fusion] at C4-5
and at C6/7. Severe scoliosis is identified,
involving a 18 degree levoscoliosis of the
thoracic spine, with the apex at T3, measuring
from the inferior endplate of the T2 to the
inferior endplate of T6.  There is a 46 degree
dextroscoliosis of the thoracic spine, with the
apex at T4, measuring from the inferior endplate
of T2 to the superior endplate of T12. There is a
41 degree levoscoliosis with the apex of L2/3,
measuring from the superior endplate of T12 to the
inferior endplate of T4.  When the patient pends
to the left, the lumbar scoliosis reduces to 32
degrees and the thoracic curvature remains
essentially unchanged at 45 degrees.  When the
patient bends to the right, the thoracic curvature
decreases to 14 degrees and the lumbar scoliosis
increases to 47 degrees.  There is no significant
exaggeration of kyphosis on the lateral view.

[Tr. 444-45].


### 5.   CAT-CT Abdomen and Pelvis

A CAT-CTA scan of the abdomen and pelvis was taken on

January 4, 2010, indication: back pain and question of aortic

disease. [Tr. 244-46]. For purposes of this ruling, the Court

notes the findings relating to plaintiff's scoliosis. CT scans

revealed "39 degrees of dextroscoliosis as measured from T4 to

T12 [tr. 244] and "25 degrees of lumbar levoscoliosis is measured

from L1 through L5. At L2-L3, there is irregular, predominantly

right sided narrowing of the disc space with endplate sclerosis

and osteophytosis." [Tr. 245].

A CAT-CT scan of the abdomen and pelvis was taken on May 16,

2011, history: hematuria and left upper abdominal pain. For
purposes of this ruling, the Court notes the findings relating to
plaintiff's scoliosis.  "There is S-shaped scoliosis of the
thoracic lumbar spine. Degenerative changes are noted throughout.
Approximately 7mm sclerotic focus in the left sacrum and 6 mm
sclerotic focus in the left iliac bone, likely representing bone
islands. No suspicious lytic or blastic bony lesions are
identified."  [Tr. 286].

### 6.   Connecticut Pain & Wellness Center, LLC

Plaintiff received a right L3-4, L4-5, L5-S1 Transforaminal
Epidural Injections ("TFESI"), Trigger Point Injections (TPI), or
Lumbar Medial Branch Blocks (MBB) on March 17 and 20, April 30,
June 11 and 27, August 30, and November 7, 2007; April 11 and 24,
and September 16, 2008; December 15 and 21, 2010; January 11,
February 8, March 8 and 10, June 14, and September 13, 2011;
February 14, and April 11, 2012. [Tr. 289-90; 297-99; 306-07;
308-09; 310-11; 312-13; 336-37; 344; 345-46; 347-48; 349-50; 351-
52; 353-54; 355-56; 357-58; 359-60; 361-62; 363-64; 365-66; 367-
68; 369-70; 448-50; 451-53; 456-58; 459-60; 461].  The treatment
notes associated with visits for injections were short and
generally restated boilerplate language regarding the medical
procedure.

Treatment notes from March 13, 2007, regarding "Subjective"

complaints reported by plaintiff state,

As you know Anna Durante had been suffering from chronic lower back and leg pain for close to one year. She reports participating in Yoga class and felt a "popping" sensation during one of the stretching exercises. Prior therapies have included pain medication, acupuncture, PT (0% relief), and rest. Currently her LBP (30%) is constant, sharp pain that radiates to her right buttock, antero-lateral thigh, calf, and heal. Her leg pain is "sharp, throbbing, and shooting" in nature. Sitting, getting up and activity worsens her pain. Cominox and rest provides some relief. She also reports mild neck pain (80%) that is sore and crampy and radiates to her b/l scapular region. The patient denies fecal or urinary incontinence, weakness, weight loss, or visual changes.

Prior therapies have included: massage therapy, chiropractic, warm heat, physical therapy. Palliating activities include rest, pain medications. Exacerbating activities include walking, bending and getting up from rest. Anna Durante is capable of performing routine ADL's without difficulty.

Previous diagnostic studies were not available during today's examination and include: MRI pending.

Neurological Exam:

Cranial Nerves II-XII
Motor function: 5/5 throughout, symmetric.
Reflexes: UE/LE 2+, symmetric, nl throughout
Sensory: Normal cold/pinprick/light touch, NO Allodynia/Hyperesthsia
Gait: normal gait, no assist device
Negative Clonus/Babinski UE/LE

Focused Spine Exam:

L/C Extension: L=20 deg, right pulling pain
L/C Flexion: 40 deg
L/C Rotation/Lateral Bend: 40 deg

Normal Straight leg, Patrick's, Gaenslen's, SI
tenderness test. No point tenderness over the
paravertebral lumbar facets joints.

Diagnosis:
1. Spondylosis, Lumbar
2. Lumbar DDD [degenerative disc disease]
3. Lumbar radiculitis, unspecified.

Medication: Ativan

[Tr. 371-72].

Treatment notes from February 2, 2011, state that plaintiff
reported "[greater than] 70% relief from previous lumbar MBB
diagnostic blocks." [Tr. 308-09]. On February 2, 2011 and
September 13, 2011, the doctor stated that plaintiff "met all
medically necessary and insurance criteria" stating "patient has
obtained over 60-80% pain relief with dual confirmatory facet or
medical branch blocks as described by ISIS and ASIPP guidelines."
[Tr. 308-09; 458].

Plaintiff was seen for a follow-up examination on May 10,
2011, post-consult with Yale Neurosurgery.  [Tr. 297-99].  "The
patient report[ed] ongoing LBP and thigh pain. She consulted with
Yale neurosurgery per my request. She was offered a major spinal
surgery that was not necessarily recommended. Dr. Laurans
recommended a SCS [spinal cord stimulation] trial as well.
Currently her LBP (70%) . . . ." [Tr. 297]. The remainder of the
subjective report, objective examination and diagnosis was

15

unchanged from March 10, 2011. Ryzolt was prescribed for pain.

[Tr. 297-98].   Treatment notes regarding "Subjective" complaints

reported by plaintiff state,

> lumbar paraspinal muscle spasms. She is pending
> surgical evaluation in the upcoming weeks. She
> defers on NSAIDs due to gastritis. Currently her
> LBP (30%) is constant, sharp, pain that radiates
> to her right buttock, antero-lateral thigh, calf,
> and heal. Her leg pain is "sharp, throbbing, and
> shooting" in nature. Sitting, getting up and
> activity worsens her pain. Combinox [medication]
> and rest provides some relief. She also reports
> mild neck pain (80%) that is sore and crampy and
> radiates to her b/l scapular region. The patient
> denies fecal or urinary incontinence, weakness,
> weight loss, or visual changes.

[Tr. 300-02]. The remainder of the objective

examination and diagnosis was unchanged from March 13,

2007. [Compare Tr. 371-72 with Tr. 300-02].

On November 18, 2011, Dr. Rahul Anand, an anesthesiologist

with Connecticut Pain & Wellness Center, LLC, performed a

"[b]ilateral lumbar radiofrequency ablation ["RFA"] rhizotomy at

the left L1, L2, L3 L4 medial branch nerve and the right L3, L4,

L5 . . . medial branch nerve." [Tr. 454].

Treatment notes from April 11, 2012, set forth

> Clinical Efficacy Criteria: 1. The patient
> reported over 80% improvement with pain and
> functional during the acute therapeutic phase; 2.
> The patient reported over 50% improvement of pain
> scores and functional status over a 6 week period
> or longer during the therapeutic phase; 3. The
> patient has reduced overall pain medication

consumption, has improved ADL's and remains stable
on their pain regimen.

[Tr. 449].

On April 28, 2012, Dr. Anand provided a letter to "Attorney
Carter Mario," stating he was authorized by Ms. Durante to
provide "a functional capacity evaluation due to her ongoing
lumbar pain syndrome." [Tr. 463].
The letter states in pertinent part that, based on the clinical
and radiographic findings,

> The patient carries the diagnosis of Severe
> Idiopathic Scoliosis, Lumbar Radioulopathy, Lumbar
> Facet Syndrome, Depression, and Myofascial
> Syndrome. I believe within a reasonable degree of
> medical probability that Mrs. Durante suffers from
> a significant lumbar spine condition that is
> likely to require major lumbar reconstructive and
> fusion surgery in the near future. Her medical
> conditions continues to progress gradually with
> time, and will continue to require further medical
> and surgical therapy.
> . . . .
>
> According to the AMA guide to the evaluation of
> permanent impairment, 6th edition, the patient has
> a 27% partial permanent disability of her lumbar
> spine condition.
>
> Due to her chronic pain condition the patient
> requires sedentary work capacity and severe
> functional limitations. Furthermore, the patient
> has an education of the 12th grade and higher, and
> is only capable of low impact duties. Based on the
> months I have been treating Mrs. Durante, I would
> recommend the following modified-work duties:
> 1. Limit carrying or lifting of weights to less
>    than 10 pounds.
> 2. The patient should be allowed to take breaks
>    (5-6/day) and change position from sitting and
>    standing.

3. Avoid activities such as climbing ladders,
   balancing, stooping, extending, and lifting.
4. Avoid extremes of temperatures, specifically
   cold and hot temperature.
5. The patient should not lift, climb, or pull for
   any long period of time.

[Tr. 463].

### 7.  Yale Neurosurgery

Plaintiff was seen for a neurosurgery consultation at Yale

Neurosurgery on April 25, 2011, with Dr. Maxwell Laurans. [Tr.

294-95]. The doctor noted that Ms. Durante was diagnosed with

scoliosis at age thirteen and did not notice symptoms until she

was in her thirties. Noted symptoms were largely back pain on the

right side radiating down her right leg. "Mostly it runs

posteriorly and postero-laterally and occasionally will run down

towards the foot." [Tr. 294]. The doctor noted no bowel or

bladder symptoms, no falls or recent traumas and no evidence of

weakness. [Tr. 294]. Plaintiff's prior medical/surgical history

included mitral valve prolapse and scoliosis, surgical fusion at

C5-C6, double mastectomy, rhinoplasty, and tonsillectomy. [Tr.

294]. The doctor noted that plaintiff "works as a hairdresser and

owns her[] own business." [Tr. 294]. On examination, the doctor

noted that plaintiff had "5 out of 5 strength in her upper and

lower extremities throughout. She has some pain-limited weakness

of knee flexion. She has an absent patellar reflex on the right,

2+ on the left. She has no clonus[3] and toes are downgoing. She has no Hoffman's."[4] [Tr. 294].  The Doctor noted a significant scoliotic deformity at L2-L3 and L3-L4. [Tr. 295].

> IMPRESSION AND PLAN: although there is not significant nerve root compression on the imaging I suspect that when Anna is up and around and moving that this causes a radicular component to her pain, as well as the instability caused by her significant scoliotic deformity radiating down through her spine into her hip. She has asked about potential surgical interventions. She has already had steroid injections, which are helpful for her for several weeks, as well as core-strengthening and stretching exercises.  I have encouraged her to also consider NSAIDS. She states she had had trouble with her stomach in the past and has just finished a course of treatment for H-pylori. I have encouraged her to re-address this with her PCP. Surgical intervention for this lesion would consist of a multilevel fusion. I would approach this through a DLIF approach from the convex side and then posterior screws for stabilization of the back with or without facetectomies on that side. We would probably obtain updated imaging if we were to go down that route. I think the chance of success for her would be roughly in the 60% range with 30% chance of being unchanged and a 10% chance of being worse. Anna does not wish to pursue a surgical intervention at this time and this is reasonable and is really related directly to whether or not she has symptomatology severe enough that she would want to pursue surgery. She will return to

---

3 Clonus. Clonospasm; a form of movement marked by contractions and relaxations of a muscle, occurring in rapid succession. Stedman's Medical Dictionary 318 (25th ed. 1990).
4 Hoffman's S., (1) in latent tetany mild mechanical stimulation of the trigeminal nerve causes severe pain; (2) Hoffmann's, digital, or snapping reflex; flexsion of the terminal phalanx of the thumb and of the second and third phalanges of one or more of the fingers when the volar surface of the terminal phalanx of the fingers is flicked.  Stedman's Medical Dictionary 1420 (25th ed. 1990).

clinic on a prn basis. I will also present her
case at our Spine Conference to see if there are
any additional recommendations.

[Tr. 295].

### 8. Spine Scoliosis NY/CT

On March 22, 2012, plaintiff consulted with Dr. Krishn

Sharma for an evaluation of scoliosis. Dr. Sharma noted that

plaintiff's pain was "focused more on the right side and radiates

into the right groin and into her right leg," although she

experiences pain on her left side as well. [Tr. 446].

She is limited in terms of her activity. She owns
her own beauty salon. She can only work for two or
three hours a day. She used to work full time. She
has difficulty at home with her activities of
daily living. Her husband has been helping her out
a lot but it is challenging for them because he
works full time also. She denies any recent
injuries or illnesses. No recent changes in her
bowel or bladder habits.

. . .

IMPRESSION: My impression is that Ms. Durante has
idiopathic scoliosis with degenerative changes. We
spoke at length today in the office. She may be a
candidate for surgical correction. I want to take
a look at bending x-rays as well as full length
spine x-rays to make some measurements to see what
would be involved. We talked briefly about the
procedure today in the office. Once she gets the
x-rays done, we will talk again. I will let her
know what would need to be involved should she be
a candidate for surgery.

At this point, I will have her continue to work
with Dr. Anand [Anesthesiologist with CT Pain &
Wellness Center, LLC]. I will see her back after
the x-rays.

[Tr. 446-47]. There are no further treatment records from Dr. Sharma.

### 9.   Dr. John Farens

Plaintiff was seen by her primary care physician John Farens, M.D., on February 6, (vomiting, diarrhea, nausea, headache),  August 9, (back and wrist pain due to a fall), November 12, 2009 (rash, fever, sore throat), and January 6, (post-hospital check), January 11, (illegible), August 31, (palpitation, chest pain, headache nausea), December 13, 2010, (back pain); April 25, (back pain), May 12, (nausea, dizziness, loss of appetite),  2011. [Tr. 393-402].

Prescription medications were written on the following dates: May 26, (Xanax), July 8, October 20, (illegible), December 10, 2009,(Combunox); January 10, (illegible), March 15, (Compazene), April 6 (Xanax), July 19, (Lorazepam), November 23, (Vicodin), December 1, (Z Pak), 2010; January 24, (Nucynta), February 8, (Diazepam), March 3, (Nucynta), March 15, (Diazepam), March 29 (Helidac), April 8, (Nucynta), April 7, (Diazepam), May 10, (samples given for Lexapro), May 18, (Diazepam), May 31, (Nucynta and Lorazepam), July 12, (Nucynta), July 22 (Nucynta), August 25, (Nucynta), September 12, 2011 (Diazepam). [Tr. 393-402].

### 10.   Griffin Hospital

Plaintiff presented at the Emergency Department of Griffin Hospital on July 15, 2011, complaining of sharp constant pain in her low right side radiating to her right groin down her right thigh at a level of ten/ten. [374-92].  Zofran, Morphine Decadron and Toradol was administered. A x-ray of her front and lateral view of the lumbar spine was taken showing severe dextroscoliosis of the mid thoracic spine with a compensatory levoscoliosis of the mid lumbar spine with a rotary component. No appearance of any vertebral body subluxation. Noted severe disc space narrowing at L2-L3, greater on the right side along the inner curvature of the scoliosis. Prominent anterolateral osteophytes were also noted. Also noted, minimal disc space narrowing at L1-L2, greater on the right side. Normal bone mineralization. "Overall appearance is similar to the prior exam. Impression: Stable exam." [Tr. 391]. A x-ray of plaintiff's right hip showed no abnormality although mild degenerative changes were seen to the right hip. [Tr. 392].  She was released from the Emergency Department after five hours in stable condition with a prescription for Vicodin and referral to her physician. [Tr. 376, 381].

Plaintiff presented at the Emergency Department of Griffin Hospital on October 13, 2011, complaining of heart palpitations, shortness of breath and nausea. She was released with direction

to see her primary care physician Dr. Farens [Tr. 423-33].

Plaintiff presented at the Emergency Department of Griffin Hospital on January 21, 2012, stating that she fell down five steps the prior morning, landing on her right side. [Tr. 403-43]. She was complaining of right sided pain, ten/ten, starting below her shoulder blade, radiating down her back, right buttocks and right leg. [Tr. 410]. Plaintiff was treated with pain medication, prescribed Zofran and advised to ice the areas and released home with directions to follow-up with her physician. [Tr. 410].

### 11.  Physical Residual Functional Capacity Assessments

Relying on the evidence of record, Doctors Virginia H. Rittner and Anita Bennett concluded that Ms. Durante was not disabled and the doctors found plaintiff's statements partially credible. [Tr. 57-64; 66-75].

On June 8, 2011, Dr. Virginia Rittner provided a physical RFC assessment. [Tr. 61-64]. The doctor found that, although plaintiff had exertional limitations she could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk a total of six hours in an eight hour day, sit for a total of about six hours in an eight hour day, and her ability to push and/or pull was unlimited. [Tr. 61]. The doctor found postural limitations, stating plaintiff could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance and stoop. [Tr. 61]. The doctor found no manipulative,

visual, communicative, or environmental limitations, but found plaintiff should avoid concentrated exposure to hazards. [Tr. 62]. Finally, the doctor stated, "objective evidence not fully consistent with allegation of complete and total physical disability-clmt stmts partially credible." [Tr. 62].

An additional physical RFC assessment was performed by Dr. Anita Bennett on October 13, 2011. [Tr. 66-75]. On reconsideration, Ms. Durante made a claim that her condition worsened since completing the last disability report. [Tr. 67]. Dr. Bennett found that plaintiff's statements regarding her symptoms, considering the total medical and non-medical evidence in the file ,were "partially credible" as the "severity of the stated limitation is out of proportion to that supported by objective MER [medical evidence of record]. [Tr. 71]. The doctor found that, although plaintiff had exertional limitations, she could occasionally lift and/or carry ten pounds; frequently lift and/or carry ten pounds; stand and/or walk a total of four hours in an eight hour day, sit for a total of about six hours in an eight hour day, and her ability to push and/or pull was unlimited. [Tr. 72]. The doctor found postural limitations, stating plaintiff could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch and crawl. [Tr. 72]. The doctor found no manipulative, visual, communicative, or environmental limitations, but found plaintiff

should avoid concentrated exposure to hazards. [Tr. 72-73].

Dr. Bennett stated,

Clmt has long hx of scoliosis. She has hx of low
grade, chronic back pain for several years. 4/11
rx neurosurgery MD note states that she has had
worsening back pain over the last several years.
Symptoms are largely back pain with radiation down
RLE. No weakness. Exam notes 5/5 motor strength,
absent patellar reflex on L, no other abnormal
neuro findings. MRI showed significant scoliotic
deformity at L2-3 and L3-4 with DDD changes as
well, more prominent or R. MD states that although
there is not significant nerve root compression on
imaging, he suspects weight bearing and moving
around does cause a radicular component to [t]he
pain.  Multilevel fusion discussed, but claimant
does not wish to pursue this option. MD recommends
core strengthening and stretching exercises as
well as NSAIDs.  Imaging of 7/11 is not
significantly changed.

MER supports the restrictions as above, based on
her chronic pain, which worsens with prolonged
weight bearing.

[Tr. 73].

### 12.  Assessment of the Individual's Ability to Perform Past Relevant Work

On June 8, 2011, Alicia Alfson, Disability

Adjudicator/Examiner, found that plaintiff had the RFC to perform

her past relevant work as a hairdresser.  Based on the documented

findings, it was determined that plaintiff was not disabled.  "We

have determined that your condition is not severe enough to keep

you from working. We considered the medical and other

information, your age, education training, and work experience in

25

determining how your condition affects your ability to work."
[Tr. 63-64].

On reconsideration, on October 13, 2011, Lula Bardos, Disability Adjudicator/Examiner, found that plaintiff did not have the RFC to perform her past relevant work as a hairdresser. [Tr. 74]. Ms. Bardos determined that plaintiff had the RFC for sedentary work and could perform other jobs in the national economy such as dial marker, DOT 729.684-018, SVP 2; telephone solicitor, DOT 299.357.014, SVP 2; and surveillance system monitor, DOT 379.367-010, SVP 2. [Tr. 74]. Again, the Disability Adjudicator found plaintiff was not disabled. [Tr. 75].

B.   ***Work History Report***

Plaintiff completed a Work Activity Report (Self-Employed Person) dated April 29, 2011, stating she was the sole owner of Capelli Salon, located in Derby, Connecticut. [Tr. 175-77]. She stated she offered hair services; she used to work from 9AM to 5PM or 7PM, but has cut her hours to 9AM to 1PM or 2PM. [Tr. 175].

C.   ***Activities of Daily Living Report***

Plaintiff completed an Activities of Daily Living ("ADL") report on May 18, 2011. [Tr. 167-74]. At the time of the report, plaintiff was living in a house with her family. [Tr. 169]. She described a typical day that included getting her twelve year old

26

off to school, household chores, working for four to five hours
as a hairdresser, returning home to cook dinner, clean and go to
bed. [Tr. 169]. She stated her sleep was interrupted by "sharp
pain" if she adjusts her sleeping position. [Tr. 170]. She
explained that her illness affected her ability to care for hair,
"can't hold my arms up or turn to style w/blow dryer." [Tr. 170].
She needed no special reminders to take care of personal grooming
or to take medication. [Tr. 170]. Plaintiff was taking the
following prescription medications: Neurontin (if needed), Ryzol-
daily, injections (when authorized), RFA (every six months), and
Lidocaine pain patches (when needed). [Tr. 171].

Plaintiff indicated she prepared her own meals daily. [Tr.
171]. "Trying to cook and eat healthy to stay fit, not put on
weight, to add more pain to my problem." [Tr. 171]. She was able
to do limited cleaning, laundry once a week. "I need help in
cleaning, my family has taken a lot of it away from me . . .
because when I do it, I am in pain for days after." [Tr. 172].
Plaintiff did not indicate how often she went outside but stated
she travels by car and can travel alone. [Tr. 172]. She was able
to shop for groceries once a week for an hour or more. [Tr. 168].
She indicated she can pay bills, count change and use a
checkbook/money orders, and her ability to handle money has not
changed since her illness. [Tr. 168]. Plaintiff listed her
hobbies as reading, walking, and "sometimes" watching television.
She stated she "used to walk every day, now I am only able to do
it once or twice a week if I can." [Tr. 168]. Social activities
include "church, work, watch my son play football, family

outings." [Tr. 167]. She indicated no problems getting along with family, friends, neighbors, or others. [Tr. 167].  She stated she does not need reminders to go places or someone to accompany her. [Tr. 167].

Plaintiff indicated she has difficulty lifting, stair climbing, sitting, and standing. [Tr. 167]. She could not estimate how long she can walk until taking a rest interval. [Tr. 173]. She can pay attention all day, can finish what she starts, cannot follow written instructions "that well" but is "somewhat better" at following spoken instruction, gets along with authority figures, has never lost a job because of problems getting along with others, and handles stress and change in routine "not very well. [Tr. 173].

Plaintiff completed another Activities of Daily Living ("ADL") report on September 2, 2011. [Tr. 187-94]. She described a typical day that included working for a few hours, "then come home and put ice and heat and lay on the couch. . . haven't worked for Aug. too much." [Tr. 187]. She stated she gets "very little sleep due to pain." [Tr. 188]. She explained that her illness affected her ability to care for hair,  "I have my hair washed." [Tr. 188]. She stated she needed no special reminders to take care of personal grooming, but needed reminders to take medication; "my pain is constant and I can't remember when I'm due for another dose." [Tr. 188]. Plaintiff was taking the following prescription medications: Nucynta (three times a day), Neurontin (once daily), Diazepam (once daily), Motrin (twice daily). [Tr. 189].

Plaintiff indicated her husband or mother-in-law prepares the meals. [Tr. 189]. She stated she does not prepare meals because it "takes me longer to prepare." [Tr. 189]. She said she has "a friend clean for [her], [her] husband cooks for [the family] and [her] mother in law helps w/[her] laundry." [Tr. 190]. Plaintiff stated she goes out once a day to get the mail; she can go out alone "with my son to help me carry bags."[Tr. 172]. She drives alone only when her husband is not around. [Tr. 191]. She is able to shop for groceries once a week with her son. [Tr. 168]. She indicated she can pay bills, count change and use a checkbook/money orders, and her ability to handle money has not changed since her illness. [Tr. 191]. Plaintiff listed her hobbies as reading, watching television. She stated "no more physical activity, exercise, or gardening, or playing with dogs. [Tr. 191]. Social activities include "church, and "football practice for my son." [Tr. 192]. She needs someone to accompany her and goes out as little as possible. [Tr. 192]. She indicated no problems getting along with family, friends, neighbors, or others. [Tr. 192].

Plaintiff reported difficulty lifting, stair climbing, squatting, sitting, bending, standing, and reaching. [Tr. 192]. "I can walk for maybe 20 minutes or less sometimes and I don't lift anything over 5 lb. like pans or wet clothes." [Tr. 192]. She estimated she could walk for twenty minutes, with pain before taking a rest interval. [Tr. 193]. She can pay attention "not too long", cannot finish what she starts, can "never" follow written instructions but can follow spoken instruction "pretty well,"

gets along with authority figures, has never lost a job because of problems getting along with others, and handles stress and change in routine "not very well." [Tr. 193]. She has noticed a "fear of death or accident or fall[ing]." [Tr. 193]. She remarked, "My condition has worsened rapidly and is affecting my social life, my marriage, my sex life, and my mental state. I feel depressed all the time and gave up a lot of my friends and activities." [Tr. 194].

**D.    *Disability Report-Appeal***

A Disability Report-Appeal, undated, indicates that since plaintiff's last disability report dated May 9, 2011, plaintiff reported that her pain had increased steadily and she "cannot cook or grocery shop or partake in children's recreation games," beginning on approximately July 1, 2011. [Tr. 181-86]. Changes to ADLs included "not able to cook, grocery shop, or go to family outings due to pain." [Tr. 184].

A Disability Report-Appeal, Form SSA-3441, undated, completed by plaintiff, states that as of August 2011, she is experiencing "more pain, more disabling depression setting in and less activity"; "right leg pain is intense, making me depressed, due to fact nothing helps." [Tr. 202].  Regarding ADLs, she stated, "very inactive, a lot of pain my husband helps me take a bath and he does all house work, and cooking now." [Tr. 206]. "I do less and less every day. I don't exercise at all anymore. I try to stretch for the pain. I put heat and ice on all the time." [Tr. 207].

E.   *Medications*

An undated Claimant's Medications Form lists the following prescriptions:  Nucynta (100mg for pain), Diazepam (10mg anxiety), Neurontin (800mg for pain), Lidocaine Patch (once daily for pain). [Tr. 214].

V.   HEARING TESTIMONY

A.   Plaintiff's Testimony

Plaintiff, represented by counsel, testified before ALJ Amita Tracy on May 2, 2012. [Tr. 24-41].  Vocational Expert ("VE") Albert Sabella was present and testified. [Tr. 41-48].

At the time of the hearing, plaintiff was living with her husband and three children in a house. [Tr. 29].  She is a high school graduate and completed a certificate program at a cosmetology/hairdressing school. [Tr. 30-31]. She worked as a hairdresser since completing the program. Currently she owned a hairdressing salon with her husband.  Since the onset of her disability in approximately November 2010, plaintiff went from a ten hour workday, five days a week, to her then-current part-time schedule. [Tr. 29, 30]. She testified that, at the time of the hearing, she was working four to four and a half hours per day, four days a week. [Tr. 30]. She estimated a fifty-five percent decrease in her client load over the last couple of years. [Tr. 40].  Her salon ownership duties also included some bookkeeping

in the evenings with her husband. [Tr. 31-32].

A typical day consists of waking at 7AM, seeing her thirteen year old son off to the bus stop, showering, work from approximately 9:30 AM to about 1:00 to 1:30 PM. Work duties include cutting hair, applying hair color, sweeping hair out of the way, "whatever is involved for that day." [Tr. 38]. She states she returns home and applies a heating pad or an ice pack and takes her medication. Her husband is home around 2:45PM. She testified that he has "taken on a lot of the tasks around the house" such as washing clothes, washing floors, vacuuming, changing sheets, cooking dinner, and washing dishes; [tr. 38-39]; that she tells her husband what to do, puts dishes in the sink and helps to clean up in the bathroom. [Tr. 39]. On occasion she takes her son to activities. She stated she no longer goes out "very often" to dinner and they stopped going dancing. [Tr. 39]. She has two dogs, but her sons take care of them. [Tr. 39].

Plaintiff stated she cannot sit or stand for extended periods and is precluded from doing heavy work. [Tr. 32]. She estimated she can sit for twenty to twenty-five minutes; stand and walk for fifteen or twenty minutes; and lift or carry five to ten pounds. [Tr. 37]. She testified that when she reaches her limitation to stand or sit, she will take a break, apply an ice pack and take medication if it's due. [Tr. 40]. She estimated that it can take from fifteen minutes to an hour to recover. [Tr.

32

40].

Plaintiff complains of pain to her lower right side that travels to the front of her knee. [Tr. 35]. She experiences a "constant little sharp feeling." [Tr. 35]. "I'm in pain every day . . . all day . . . it subsides with pain medication but it's there." [Tr. 36]. At the time of the hearing, plaintiff had consulted with a specialist and surgery was scheduled for July 2012, to correct the alignment of her vertebra. [Tr. 36]. She said the doctor hoped for ninety percent relief of her pain. [Tr. 36]. She stated her pain specialist, Dr. Anand, had suggested a surgical option since 2008/09. [Tr. 36].

Plaintiff testified that prescription medication is effective a short time and makes her very tired and drowsy. [Tr. 33]. Epidural injections work for a two or three week period. Treatment for pain also included an RFA [Radiofrequency Ablation] procedure, which she described as an injection of "heat up to 180 degrees where they numb the nerve where the pain is," which "worked somewhat better than the injections." [Tr. 34]. She also wears pain patches. [Tr. 34]. She testified that she was treated by Dr. Anand, Connecticut Pain and Wellness Center. [Tr. 34].

Plaintiff testified that she takes medication for anxiety but does not meet with a counselor or receive other mental health care treatment. [Tr. 34]. She testified that the medication for anxiety "does help" [Tr. 35]; that she is probably depressed and

33

that Dr. Anand suggested Cymbalta "but I don't want to do that yet." [Tr. 38].

B.   *Vocational Expert Testimony*

Vocational Expert ("VE") Albert Sabella testified at the hearing on May 2, 2012. [Tr. 41-48].

With regards to the exertional and skill requirements of plaintiff's last job, the VE stated that the Dictionary of Occupational Titles (DOT) classifies a hairstylist under "332.271-018, as light and skilled work with an SVP: 6."[5] [Tr. 43].

In the first hypothetical, the ALJ asked the VE to assume a person of the claimant's age, education, and work history who is

limited to light work except that the individual could sit, stand, and/or walk up to six hours in an eight hour work day. The individual is limited to occasional climbing of ramps and stairs, occasional climbing of ladders, ropes or scaffolds, occasional balancing, occasional stooping, occasional kneeling, occasional crouching, and occasional crawling. Can that hypothetical individual perform . . . the past job that you described as actually or generally performed?

The VE responded, "Yes." [Tr. 44].

The ALJ also asked whether that hypothetical individual

---

5 The DOT lists a specific vocation preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. §§404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.

could perform any other work? The VE responded "yes;" "it would

be light and unskilled because there is no transferrable skills."

[Tr. 44]. The VE identified representative occupations to include

cashiering, DOT 211.462-010, with approximately 10,000 positions

in the Connecticut regional market, and nationally about

2,000,000; cleaning type work, DOT 323.687-014, with

approximately 1,500 positions in the Connecticut regional market,

and nationally about 2,000,000; and electronic parts inspection

under DOT 727.687-054, with approximately 3,000 positions in the

Connecticut regional market, and nationally about 1,000,000. [Tr.

44].

In the second hypothetical, the ALJ asked the VE to assume

that the individual would be limited to

> Sedentary work except that the individual could
> stand and/or walk up to four hours in an eight-
> hour workday, and sit up to six hours in an eight-
> hour workday. The individual can occasionally
> climb ramps and stairs, occasionally climb
> ladders, ropes or scaffolds, occasionally balance,
> occasionally stoop, occasionally kneel,
> occasionally crouch, and occasionally crawl. Can
> that hypothetical individual perform any of the
> past job . . . that you described?

The VE responded, "no"; the hypothetical individual would not be

able to perform her past work. However, the VE opined that the

hypothetical individual could perform other work such as

electronic inspection under DOT 727.684-050; assembly types of

work under DOT 734.687-018, with approximately 2,000 positions in

the regional labor market, and nationally about 1,500,000; and machine tending types of positions under DOT 681.685-030, with approximately 600 positions in the regional labor market, and nationally about 750,000. [Tr. 45-46].

The third hypothetical posed by the ALJ asked the VE to assume a hypothetical individual from hypothetical one and two, but that the individual had a sit/stand option defined as sitting and standing for fifteen minutes. The VE responded that although the sit/stand option is not covered within the DOT, there are some jobs that would permit the ability to sit or stand as described but that the hypothetical person would not be able to do the past type of work. "[C]hanging positions in fifteen minute intervals is a significant disability . . . so it would reduce the numbers by seventy-five to eighty percent" for both the sedentary and light positions described. Although the positions are still representative, there would still be assembly, inspection, machine tending, cashier, and cleaning types of work with a sit/stand option.  [Tr. 46-47]. He gave as an example a cashier working in a parking garage. [Tr. 47].

Finally, the ALJ added to his hypothetical an individual who would be off task twenty percent of the time due to the need for additional breaks beyond normal breaks in an eight hour workday. The ALJ asked if there was any work for that individual? The VE responded, "no, because all employment inherently needs one to be

36

productive, and maintain a persistence of pace." [Tr. 48].

Plaintiff's counsel declined to cross-examine the VE. [Tr. 48].

### VI. LEGAL STANDARD AND SCOPE OF REVIEW

This Court's review of the Commissioner's decision is limited, as it may be set aside only due to legal error or if it is not supported by substantial evidence. See 42 U.S.C. §405(g) (providing that the Commissioner's factual findings are conclusive if supported by substantial evidence); Yancey v. Apfel, 145 F.3d 106, 110–11 (2d Cir. 1998). "Substantial evidence" is less than a preponderance but "more than a mere scintilla" and as much as "a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). "Thus, as a general matter, the reviewing court is limited to a fairly deferential standard." Gonzalez ex rel. Guzman v. Commissioner, 360 Fed. Appx. 240, 242 (2d Cir. 2010) (summary order) (citing Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)). If the decision of the ALJ evinces legal error or is unsupported by substantial evidence, the Act provides that the "Court shall have the power to enter . . . a judgment . . . reversing a decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

To be considered disabled under the Act and therefore entitled to benefits, Ms. Perez must demonstrate that she is unable to work after a date specified (in her application, she claimed January 1, 2010) "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id.; §423(d)(1)(A). Such impairment or impairments must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. §423(d)(2)(A); see also 20 C.F.R. §404.1520(c) (requiring that the impairment "significantly limit [ ] . . . physical or mental ability to do basic work activities" to be considered "severe").

There is a familiar five-step analysis used to determine if a person is disabled. See 20 C.F.R. §404.1520. In the Second Circuit, the test is described as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him

> disabled without considering vocational factors such as
> age, education, and work experience . . . . Assuming
> the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional
> capacity to perform his past work. Finally, if the
> claimant is unable to perform his past work, the
> [Commissioner] then determines whether there is other
> work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry

v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam))

(alterations in original).

Through the fourth step, "the claimant carries the burdens

of production and persuasion, but if the analysis proceeds to the

fifth step, there is a limited shift in the burden of proof and

the Commissioner is obligated to demonstrate that jobs exist in

the national or local economies that the claimant can perform"

given what is known as her "residual functional capacity."

Gonzalez, 360 Fed. Appx. at 243 (citing Poupore v. Astrue, 566

F.3d 303, 306 (2d Cir. 2009) (per curiam)). "Residual functional

capacity" is what a person is still capable of doing despite

limitations resulting from her physical and mental impairments.

See 20 C.F.R. §416.945(a).

"In assessing disability, factors to be considered are (1)

the objective medical facts; (2) diagnoses or medical opinions

based on such facts; (3) subjective evidence of pain or

disability testified to by the claimant or others; and (4) the

claimant's educational background, age, and work experience."

Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978).
"[E]ligibility for benefits is to be determined in light of the
fact that the Social Security Act is a remedial statute to be
broadly construed and liberally applied." Id. (quotation marks
and citation omitted).

### VII. ALJ'S DECISION

In this case, the ALJ undertook the prescribed five-step
analysis and concluded that Ms. Durante was not disabled. After
finding, at step one, that she had not engaged in any substantial
gainful activity since January 1, 2011, her alleged onset date,
[tr. 10], the ALJ determined, at step two, that Ms. Durante had
the following severe impairments: scoliosis and lumbar
degenerative disc disease. [Tr. 13].  At step three, the ALJ
concluded that plaintiff did "not have an impairment or
combination of impairments that meets or medically equals one of
the listed impairments" in 20 C.F.R. Part 404, Subpart P,
Appendix 1. [Tr. 14].

Since the ALJ found that Ms. Durante was not disabled *per
se* at step three, he proceeded to step four, which is to
identify her "residual functional capacity," or "RFC." The ALJ
found that plaintiff retained the RFC to perform:

> Sedentary work as defined in 20 CFR §404.1567(a)
> except the claimant can stand/walk 4 hours of an 8
> hour workday and sit 6 hours of an 8 hour workday.
> The claimant can occasionally climb ramps, stairs,

ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl. The claimant requires a sit/stand option defined as sitting for 15 minutes and standing for 15 minutes.

[Tr. 14-15].

At step four, the ALJ found that plaintiff was not capable of performing her past relevant work as a hairdresser through the date last insured. [Tr. 17].

Finally, at step five, after considering Ms. Durante's age, education, work experience, RFC, and the vocational expert's testimony, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Ms. Perez can perform. [Tr. 17-19].

## VIII.   DISCUSSION

On appeal, plaintiff asserts the following arguments for reversal or remand:

1. Whether the ALJ properly evaluated plaintiff's credibility and claims of pain;

2. Whether the ALJ properly followed the treating physician rule;

3. Whether the ALJ's functional capacity assessment is supported by substantial evidence.

The Court will consider each of Ms. Durante's arguments in turn.

### A.   *Evaluation of Credibility and Complaints of Pain*

The ALJ is required to assess the credibility of the

plaintiff's subjective complaints. 20 C.F.R. §416.929.  Where the claimant's testimony concerning pain and functional limitations is not supported by objective evidence, the ALJ retains the discretion to determine the plaintiff's credibility with regard to disabling pain and other limitations.  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) ("The record is replete with evidence that Snell claims to experience severe and ongoing pain, even though various medical examinations have failed to discover a medical explanation for that pain.").

The courts of the Second Circuit follow a two-step process. The ALJ must first determine whether the record demonstrates that the plaintiff possesses a medically determinable impairment that could reasonably produce the alleged symptoms.  20 C.F.R. §416.929(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled."). Second, the ALJ must assess the credibility of the

42

plaintiff's complaints regarding the intensity of the symptoms.
Here, the ALJ must first determine if objective evidence alone
supports the plaintiff's complaints; if not, the ALJ must
consider other factors laid out at 20 C.F.R. §416.929(c). See,
e.g., Skillman v. Astrue, No. 08-CV-6481, 2010 WL 2541279, at *6
(W.D.N.Y. June 18, 2010).   These factors include: (1) the
claimant's daily activities; (2) the location, duration,
frequency and intensity of the claimant's pain; (3) any
precipitating or aggravating factors; and (4) the type, dosage,
effectiveness, and side effects of any medication taken by
claimant to alleviate the pain.    20 C.F.R. §416.929(c)(3)(i)-
(iv); 20 C.F.R. §404.929(c)(3)(i)-(iv).   The ALJ must consider
all the evidence in the case record.   SSR 96-7p, 1996 WL 374186,
at *5 (Jul. 2, 1996).   Furthermore, the credibility finding "must
contain specific reasons . . . supported by the evidence in the
case record, and must be sufficiently specific to make clear to
the individual and to any subsequent reviewers the weight the
adjudicator gave to the individual's statements and the reasons
for that weight." SSR 96-7p, 1996 WL 374186, at *4.   "Even if
subjective pain is unaccompanied by positive clinical findings or
other objective medical evidence, it may still serve as the basis
for establishing disability."   Correale-Englehart v. Astrue, 687
F. Supp. 2d 396, 435 (S.D.N.Y. 2010) (citation omitted). "Put
another way, an ALJ must assess subjective evidence in light of

objective medical facts and diagnoses." Williams on Behalf of
Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988).

### 1. **Factors Considered**

Plaintiff argues that the ALJ's "employs the customary
boilerplate" . . . [and] "undertakes a three paragraph analysis
that, with all due respect, says almost nothing about the
plaintiff's credibility." [Doc. #11 at 17-18 (citing 20 C.F.R.
§404.1529(c) and Social Security Ruling 96-07p, 1997 WL 374186,
*2)]; but see Filus v. Astrue, 694 F.3d 863,868 (7th Cir.
2012)("If the ALJ has otherwise explained his conclusion
adequately, the inclusion of [boilerplate] language can be
harmless."). Here, the ALJ did offer reasons grounded in the
evidence.

Plaintiff first challenges the ALJ's finding that the
plaintiff's part time work and ability to drive daily
demonstrated that her condition was not disabling. [Doc. #11 at
19]. As an initial matter, an ALJ's consideration of a claimant's
part-time work is "entirely proper" and may support an ALJ's
decision to discount a claimant's credibility. House v.
Commissioner of Soc. Sec., No. 09-CV-913 (NAM/VEB), 2012 WL
1029657, *12 (N.D.N.Y. Feb. 29, 2012) (citing 20 C.F.R.
§§404.1571, 416.971 (stating that even though part-time work does
not constitute substantial gainful activity, it may show that a

claimant is able to do more work than actually performed."). However, by merely applying for disability benefits, as a matter of law plaintiff effectively asserted that she cannot perform any substantial gainful activity. 20 C.F.R. §404.1505. Indeed, the ALJ properly considered that although plaintiff consistently reported to her medical providers that she was working on a part time basis, [tr. 30, 169, 175], she was not reporting her earnings from self-employment as required by law. [Tr. 13]. On June 14, 2011, Dr. Anand noted that plaintiff was "working full time." [Tr. 336]. Plaintiff offers no case law, besides argument, that the ALJ's consideration of her failure to report her earnings is error. Nor has plaintiff provided any contradictory evidence that she in fact did not receive any income from the onset of her disability, January 1, 2011, through her date of last insured December 31, 2011.[6] Without more, the ALJ's consideration of Ms. Durante's part time work and failure to report income was proper.

---

[6] As noted by the defendant, plaintiff reported in April 2011, that her gross self-employment income for 2010 was $8,919. [Tr. 175]. This income relates to the period just prior to plaintiff's January 1, 2011, alleged disability onset date. [Tr. 28].  There are no reported earnings for 2011 or 2012 despite plaintiff's multiple representations that she worked part time in 2011 and 2012 (compare tr. 175 with tr. 29, 30 and 161). On June 14, 2011, she reported working full time. [Tr. 336].  Medical records identified plaintiff's employment as "hairstylist and restaurant owner" in March 2007, March and May 2011. [Tr. 371, 300, 297]. Dr. Krishn Sharma noted in "initial consultation" records from March 2012, that plaintiff reported she was working two to three hours a day at her hair salon. [Tr. 446].

Similarly, a claimant's daily activities are properly considered when evaluating credibility. Ms. Durante contends that there is nothing in the record to "contradict" her testimony that household chores were transferred to her husband or that her testimony regarding her driving was "unworthy of belief. " [Doc. #11 at 19]. Here, the ALJ specifically noted that during the alleged disability period, plaintiff worked part-time four hours a day, four days a week as a hairdresser, performed some bookkeeping, grocery shopped and was able to drive daily without limitation. [Tr. 16, 30, 38, 39, 168, 172, 181, 190-91, 336]. Moreover, the ALJ also reasonably discounted the RFC opinion by Dr. Anand in part due to plaintiff's activities of daily living. [Tr. 16]. According to the Activities of Daily Living Report that plaintiff completed on May 18, 2011, a typical day included getting her twelve year old off to school, household chores, working for four to five hours as a hairdresser, returning home to cook dinner, clean and go to bed. [Tr. 169]. Regarding housework, she stated she was able to do limited cleaning, laundry and grocery shopping. [Tr. 172].  Less than four months later on September 2, 2011, plaintiff completed a second ADL report stating that a typical day included working a few hours, could take care of her personal grooming (except her hair), could take medication without reminders but she was no longer preparing meals, doing laundry or cleaning the house. [Tr. 187-94].  She

46

reported that she was able to drive alone and shop for groceries with assistance but was experiencing difficulty lifting, climbing stairs, squatting, sitting, bending, standing and reaching. [Tr. 192]. Nevertheless, plaintiff reported to Dr. Krishn Sharma in March 2012, that although she was limited in her activity, she owned a beauty salon where she worked two or three hours a day, and although she had difficulty at home with ADLs, her "husband had been helping her out a lot but it is challenging for them because he works full time." [Tr. 446]. Plaintiff testified at the hearing before the ALJ, in May 2012, that she was working as a hairdresser cutting hair and applying color between 9AM and 1:30PM four days a week [tr. 30]; she drove daily to work and to provide transportation for her son, did a "bit of bookwork", [tr. 31-32]. She estimated she could sit for twenty to twenty-five minutes, stand for fifteen to twenty minutes, walk fifteen to twenty minutes, and lift or carry five to ten pounds [tr. 37, see also 192]. Under the Social Security regulations, a single temporary worsening of less than a year cannot provide the basis for a legal finding of disability. See 20 C.F.R. §404.1505(a) ("The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. To meet this

47

definition, you must have a severe impairment(s) that makes you unable to do your past relevant work . . . or any other substantial gainful work that exists in the national economy..").

The ALJ also considered the "lack of significantly abnormal clinical and neurological findings documented by treating sources and their observations that the claimant's gait is normal which are inconsistent with the claimant's assertions regarding her functionality."[7] [Doc. #11 at 18 (citing tr. 15)]. Here, the ALJ, in rejecting the plaintiff's testimony as to severity of symptoms, applied the proper analysis set forth in the regulations, and reasonably relied on the lack of objective medical evidence in the record, the reports of the state agency medical consultants, plaintiff's ability to work part-time and the opinions of her treating physicians. [Tr. 17]. Specifically, in April 2011, Neurosurgeon Dr. Laurans found there was "not significant nerve root compression on the imaging." [Tr. 295(emphasis added)]. The doctor "suspect[ed]" that when Ms. Durante was "up and around and moving that this causes a radicular component to her pain, as well as the instability caused by her significant scoliotic deformity radiating down

---

7Although plaintiff quotes the ALJ's decision regarding the side effects from medications, the ALJ gave plaintiff the "benefit of the doubt" that she experienced drowsiness despite an absence of complaints regarding side effects documented in the medical evidence. [Tr. 16].

through her spine into her hip." Id. 9 (emphasis added). On examination, Dr. Laurans found Ms. Durante had "5 out of 5 strength in her upper and lower extremities throughout" with "some pain-limited weakness of knee flexion." [Tr. 294]. While it may be a distinction without a difference, Ms. Durante sought out an opinion "about potential surgical intervention" which was provided. Dr. Laurans "encouraged" her to consider NSAIDS and noted that Ms. Durante did "not wish to pursue a surgical intervention at this time and this is reasonable and is really related directly to whether or not she has symptomatology severe enough that she would want to pursue surgery." [Tr. 295 (emphasis added)]. The medical evidence of record during the disability period shows that plaintiff's gait was normal, (tr. 16, 298, 301, 447), and medical testing revealed that plaintiff had normal strength throughout her body after her alleged disability onset date, and even beyond her date last insured. (Tr. 294-95, 298, 301, 447). In March 2012, plaintiff reported to Dr. Sharma that pain management treatment "actually does help with her pain but she needs to have them more [] regularly and more [] frequently." [Tr. 446]. Dr. Sharma noted that plaintiff was in "no acute distress," ambulated with a non-antalgic gait, strength was 5/5, reflexes were within normal limits and seated position straight leg raise was negative. [Tr. 447].

The ALJ properly considered treatment notes, diagnostic

testing, work record, muscle testing, neurological signs and
physician's assessment in weighing evidence and credibility.
Roma v. Astrue, 468 F. App'x. 16, 19 (2d Cir. 2012) (finding the
ALJ was not required to defer to a doctor's opinion that claimant
was unable to undertake any kind of gainful employment where it
conflicted with plaintiff's "own testimony that he could perform
a reasonably broad range of light, non-stressful activities at or
near his home, including driving, reading, sending mail and
independently performing the activities of daily living while his
wife worked full time."); Michels v. Astrue, 297 F. App'x. 74,
75-76 (2d Cir. 2008) (discounting physician's assessments in
light of non-medical evidence including plaintiff's failure to
seek medical care until one year after voluntarily leaving her
job, her "extensive" self-reported daily activities, applications
for jobs and efforts to adopt another child during the period for
which she now claims benefits.); see 20 C.F.R. § 404.1527(d)(3)
("The more a medical source presents relevant evidence to support
an opinion, particularly medical signs and laboratory findings,
the more weight we will give that opinion."). Moreover, here the
state agency reviewing physician, Dr. Bennett, found that
plaintiff's activities of daily living were the most informative
factor in assessing the extent to which plaintiff's allegations
were credible. [Tr. 71].

It is the function of the ALJ, not the reviewing court, to appraise the credibility of the claimant.  Carroll v. Secretary of HHS, 705 F. 2d 638, 642 (2d Cir. 1983). The ALJ's findings, if supported by substantial evidence, must be affirmed. Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998). Here, the ALJ's consideration of plaintiff's credibility is supported by substantial evidence.

## 2.  **Assessment of Pain**

The Second Circuit has held that "the subjective element of pain is an important factor to be considered in determining disability." Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984). However, an ALJ is not "required to credit [plaintiff's] testimony about the severity of [his] pain and the functional limitations it caused." Rivers v. Astrue, 280 Fed. Appx. 20, 22 (2d Cir. 2008). "[T]he ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.'" Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).

> Because symptoms, such as pain, sometimes suggest
> a greater severity of impairment than can be shown
> by objective medical evidence alone, the
> adjudicator must carefully consider the
> individual's statements about symptoms with the
> rest of the relevant evidence in the case record

> in reaching a conclusion about the credibility of
> the individual's statements if a disability
> determination or decision that is fully favorable
> to the individual cannot be made solely on the
> basis of objective medical evidence.

SSR 96-7P (S.S.A.), 1996 WL 374186, at *3 (July 2, 1996).

There is no question that plaintiff lives with serious pain, as the record documents frequent complaints in that regard. However, "disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment. Otherwise, eligibility for disability benefits would take on new meaning." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983) (emphasis added). Moreover, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of [disability.]" 42 U.S.C. §423(d)(5)(A).

Plaintiff correctly states that she has consistently and continuously complained of pain to her treating physicians and specialists, and at her administrative hearing. The ALJ chronicled plaintiff's subjective complaints of pain in his opinion but found that her pain was not "debilitating" prior to her date last insured, December 31, 2011. [Tr. 16]. In support of his finding that plaintiff's testimony regarding the "location, duration, frequency and intensity of pain" was only "partially support[ed]," the ALJ cited plaintiff's part time work, Dr.

Laurans' conclusions, the lack of significantly abnormal clinical and neurological findings, her normal gait, driving without limitation, state agency medical opinions, state agency medical consultant, and evidence that plaintiff's condition was stable with treatment. [Tr. 16-17]. As set forth above, the Court has found that the ALJ's credibility determination was supported by substantial evidence.

Plaintiff further argues that the ALJ "critically mis-states" Dr. Laurans' surgical opinion.[8] [Doc. #11 at 20]. While the Commissioner concedes that the ALJ's description of Dr. Laurans' report is not entirely accurate," the Court finds that the misstatement does not rise to the level of reversible error. Dr. Laurans stated that "[a]lthough there is <u>not significant</u> nerve root compression on the imaging I <u>suspect</u> that when [Ms. Durante] is up and around and moving that this causes radicular component to her pain . . . ." [Tr. 295 (emphasis added)]. As set

---

8 The ALJ stated,

> Neurosurgeon Dr. Laurans noted that the most significant limitation caused by the claimant's impairments is her ability to move around (Exhibit 5F, p. 2). In assigning the residual functional capacity the undersigned has considered the claimant's testimony that she is able to work 4 hours 4 days a week and Dr. Laurans' opinion that her pain is caused by moving around and is not caused by nerve root compression, and has limited her with a sit/stand option. (Exhibit 5F, p. 2).

[Tr. 16].

forth above, the Court notes that it was plaintiff who "asked about potential surgical intervention." [Tr. 295]. While the doctor provided the requested surgical opinion, he also noted that "steroid injections helped for several weeks, as well as core-strengthening and stretching exercises." [Tr. 295]. He encouraged Ms. Durante to consider NSAIDS. Further, Dr. Laurans noted that plaintiff did not wish to pursue surgery "and this is reasonable and is really related directly to whether or not she has symptomatology severe enough that she would pursue surgery." [Tr. 295 (emphasis added)]. On examination, Dr. Laurans noted that Ms. Durante had five out of five strength in her upper and lower extremities throughout. "She has some pain-limited weakness of knee flexion. She has an absent patellar reflex on the right, 2+ on the left. She has no clonus and toes are downgoing. She has no Hoffman's." [Tr. 294]. Here the ALJ correctly noted that Dr. Laurans found that plaintiff experienced pain with movement and accordingly limited Ms. Durante to jobs that offer a sit/stand option, [tr. 16], "defined as sitting for 15 minutes and standing for 15 minutes." [Tr. 15]. "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409 (2009) (citing cases). "The party seeking reversal normally must explain why the erroneous ruling caused harm." Shinseki, 556 U.S. at 410. On this record, plaintiff has not demonstrated that this

"mis-statement" was prejudicial.

Finally, the Court finds no error in the ALJ's finding that the medical records state that plaintiff's "gait is normal" and there "is a lack of significantly abnormal clinical and neurological findings" during the disability period. [Tr. 16]. When considering "disorders of the spine," severe cases of degenerative disc disease may result in "weakness" and an "inability to ambulate effectively." 20 C.F.R. Part 404, Subpt. P, App. 1 §1.04(C) (lumbar spinal stenosis). As set forth above, there is substantial evidence to support the ALJ's findings.

**B.   *Treating Physician Rule***

 Plaintiff next argues that the ALJ erred when assigning partial weight to Dr. Rahul S. Anand's "functional capacity evaluation" provided in a April 29, 2012, letter to plaintiff's attorney.[9] [Tr. 463-64]. The ALJ found that Dr. Anand's opinions

> are not well supported by the clinical findings
> documented in the treatment notes and are inconsistent
> with the claimant's testimony regarding her
> functionality-including her ability to work 4 hours a
> day 4 days a week, sweep up hair between customers,
> and drive without limitation. (Exhibit 5F [4/25/11
> Yale Neurosurgery Consult with Dr. Laurans] and
> Exhibit 7F [Dr. Anand's Treatment Records]).

---

9 Although plaintiff refers to Dr. Anand's letter as a "Medical Source Statement," the letter does not follow the format of Social Security Administration Office of Disability Adjudication and Review Form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." http://www.dshs.wa.gov/pdf/ccs/RFQ1236-426_ExK.pdf

[Tr. 16]. Plaintiff contends that the ALJ's finding is "wholly unsupported." [Doc. #11 at 24].

Pursuant to 20 C.F.R. §404.1527(c)(2), a treating source's opinion will usually be given more weight than a non-treating source.  If it is determined that a treating source's opinion on the nature and severity of a plaintiff's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record," the opinion is given controlling weight.  20 C.F.R. §404.1527(c)(2).  If the opinion, however, is not "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques, then the opinion cannot be entitled to controlling weight.  S.S.R. 96-2P, 1996 WL 374188, at *2 (S.S.A. Jul. 2, 1996).  "Medically acceptable" means that the "clinical and laboratory diagnostic techniques that the medical source uses are in accordance with the medical standards that are generally accepted within the medical community as the appropriate techniques to establish the existence and severity of an impairment."  S.S.R. 96-2P, 1996 WL 374188, at *3 (S.S.A. Jul. 2, 1996).  Furthermore, "not inconsistent" means that the opinion does not need to be consistent with _all_ other evidence, but rather there must not be "other substantial evidence in the case record that contradicts

or conflicts with the evidence." Id. (emphasis added).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Specifically, the ALJ should consider: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Selian v. Astrue, 708 F.3d at 418 (citations omitted). The regulations require that the ALJ "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." Halloran, 362 F.3d at 32. "The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken."[10]  Khan v. Astrue, No. 11-cv-5118, 2013 WL

---

10 The parties dispute the applicability of language used in a recent Second Circuit decision discussing the treating physician rule.  In Selian v. Astrue, the Second Circuit states that, "In order to override the opinion of the treating physician, we have held that the ALJ must explicitly consider, inter alia: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." 708 F.3d 409, 418 (2d Cir. 2013) (citing Burgess, 537 F.3d at 128) (emphasis added).  Defendant contends that despite this language, "explicit" consideration of all mentioned factors is not required

3938242, at *15 (E.D.N.Y. July 30, 2013); see Petrie v. Astrue,
412 Fed. App'x. 401, 406, (2d Cir. 2011)("[W]here 'the evidence
of record permits us to glean the rationale of an ALJ's decision,
we do not require that he have mentioned every item of testimony
presented to him or have explained why he considered particular
evidence unpersuasive or insufficient to lead him to a conclusion
of disability.' " (quoting Mongeur v. Heckler, 722 F.2d 1033,
1040 (2d Cir. 1983)). Failure "to provide good reasons for not
crediting the opinion of a claimant's treating physician is a
ground for remand." Sanders v. Comm'r of Soc. Sec., 506 F. App'x
74, 77 (2d Cir. 2012) (summary order); see also Halloran, 362
F.3d at 32-33.

　　Here, a review of Dr. Anand's contemporaneous treatment

---

because (1) the holding of Halloran v. Barnhart, 362 F.3d 28, 31-
33 (2d Cir. 2004), that it is sufficient when a court can discern
from the context that an ALJ has applied the substance of the
treating physician rule, is still binding precedent; and (2)
Selian did not announce a new rule, but rather repeated what the
Second Circuit had previously held. The Court agrees.  Indeed, a
similar argument was rejected by the Second Circuit in a summary
order issued on the same day as Selian. The decision, Atwater v.
Astrue, 512 F. App'x 67 (2d Cir. 2013), was not only issued on
the same day as Selian, February 21, 2013, but Circuit Judge
Katzmann sat on both panels.  In Atwater v. Astrue, the Second
Circuit rejected the plaintiff's argument that the ALJ failed to
explicitly review each factor provided for in 20 C.F.R.
§404.1527(c), and noted, "We require no such slavish recitation
of each and every factor where the ALJ's reasoning and adherence
to the regulation are clear."  512 F. App'x at 70 (citing See
Halloran, 362 F.3d at 31-32 (per curiam) (affirming ALJ opinion
which did "not expressly acknowledge the treating physician
rule," but where "the substance of the treating physician rule
was not traversed.")).

records reveals medical evidence supporting the ALJ's decision to give partial credit to Dr. Anand's opinion regarding plaintiff's functional capabilities. As previously discussed, plaintiff never stopped working during the disability period, at least sixteen hours per week, at a job the ALJ conceded she could no longer perform on a full-time basis. Treatment notes from February 2, 2011, a month after the alleged disability onset date, state that plaintiff reported ">70% relief from previous lumbar MRB diagnostic blocks." [Tr. 308-09].  In February, and again in September 2011, Dr. Anand noted that plaintiff "has obtained over 60-80% pain relief with dual confirmatory facet or medical branch blocks . . . ." [Tr. 348, 458]. Indeed, it is important to note that the conclusions from Dr. Anand's neurological and focused spine exam on March 13, 2007, are unchanged four years later in his March 10, 2011, examination during the disability period. Compare Tr. 373-72 with Tr. 300-01. During both examinations that only medication plaintiff was taking was Ativan. [Tr. 301, 372]. In May 2011, Dr. Anand noted that plaintiff had consulted with Yale Neurosurgery "per my request. She was offered a major spinal surgery that was not necessarily recommended." [Tr. 297]. In June 2011, Dr. Anand noted that plaintiff reported that she was working full-time, and the doctor again stated that plaintiff was "not a surgical candidate." [Tr. 336].  In September, 2011, plaintiff reported ">70% relief from previous Lumbar MBB

diagnostic blocks." [Tr. 457].  Moreover, on April 11, 2012, less than four months after plaintiff's date last insured, Dr. Anand noted that plaintiff "reported over 80% improvement with pain and function[] during the acute therapeutic phase" and "over 50% improvement of pain and functional status over a 6 week period or longer during the therapeutic phase," with "reduced overall pain medication consumption . . . [and'] improved ADL's."  [Tr. 449]. On this record, the Court finds there is substantial evidence to support the ALJ's finding that plaintiff was stable with treatment and that Dr. Anand's opinion regarding plaintiff's functional capacity should be given partial weight.

Defendant concedes that the ALJ did not provide a detailed analysis of Dr. Anand's treatment records; however, "[a]n ALJ does not have to state on the record every reason justifying a decision. Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted. An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." Brault v. Soc. Sec. Admin., Comm 'r, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). The additional evidence cited above provides further support for the ALJ's conclusion that Dr. Anand's opinion was inconsistent with other evidence in the record.   See Fisher v. Bowen, 869 F.3d 1055, 1057 (7th Cir. 1989) (Posner, J.) ("No principle of administrative law or common

sense requires [a court] to remand a case in quest of a perfect
[ALJ] opinion unless there is reason to believe that the remand
might lead to a different result."); Halmers v. Colvin, No.
3:12-cv-00288 (MPS), 2013 WL 5423688, at *6 (D. Conn. Sept. 26,
2013) (citing Brault); Monguer, 722 F.2d at 1040 ("When, as here,
the evidence of record permits us to glean the rationale of an
ALJ's decision, we do not require that he have mentioned every
item of testimony presented to him or have explained why he
considered particular evidence unpersuasive or insufficient to
lead him to a conclusion of disability.") Berry v. Schweiker,
675 F.2d 464 (2d Cir. 1982) (noting that remand is appropriate
for further findings or a clearer explanation where a court
cannot fathom the ALJ's rationale "in relation to evidence in the
record," the court would not remand where "we are able to look to
other portions of the ALJ's decision and to clearly credible
evidence in finding that his determination was supported by
substantial evidence."); Miles v. Harris, 645 F.3d 122, 124  (2d
Cir. 1981) ("we are unwilling to require an ALJ explicitly to
reconcile every conflicting shred of medical testimony . . . It
is sufficient that the ALJ noted that he carefully considered the
exhibits presented in evidence in reaching his decision."). Here
the ALJ accorded "partial weight" to Dr. Anand's April 28, 2012,
opinion because his opinion was "not well supported by the
clinical findings documented in the treatment notes and are

inconsistent with the claimant's testimony regarding her functionality, including her ability to work 4 hours a day 4 days a week, sweep up hair between customers, and drive without limitation." [Tr. 16].

Because the record contained substantial evidence that was not consistent with Dr. Anand's April 28, 2012, opinion, the ALJ did not err in according partial weight to the doctor's opinion.

C.  *Residual Functional Capacity Determination*

Last, plaintiff argues that the ALJ's RFC is not supported by substantial evidence. The ALJ determined that plaintiff had the RFC

> to perform sedentary work as defined in 20 CFR
> 404.1567(a) except the claimant can stand/walk 4 hours
> of an 8 hour workday and sit 6 hours of an 8 hour
> workday. The claimant can occasionally climb ramps,
> stairs, ladders, ropes and scaffolds, balance, stoop,
> kneel, crouch and crawl. The claimant requires a
> sit/stand option defined as sitting for 15 minutes and
> standing for 15 minutes.

[Tr. 14-15].

Plaintiff questions the vocational expert's testimony, [tr. 47-48], regarding the number of jobs available to a hypothetical claimant who requires a sit/stand option. At the hearing the ALJ inquired, "but the DOT is silent on the sit stand option. So what's the basis of your testimony on that?" The VE responded, "The basis would be my activity in the job replacement services

provided to individuals, as well as the testimony that I've heard from various claimants at Social Security hearings." [Tr. 47-48]. Plaintiff was offered an opportunity to cross-examine the VE and declined. [Tr. 31]. On appeal, plaintiff argues, without more, that the VE's response was "not explained." [Doc. #11 at 30]. The Second Circuit held it is enough that a vocational expert "identified the sources he generally consulted to determine such figures," noting the "marked absence of any applicable regulation or decision of this Court requiring a 'vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation.'"    Brault, 683 F.3d at 450 (quoting Galiotti v. Astrue, 266 Fed. App'x. 66 (2d Cir. 2008)); Dugan v. Social Security Admin., Comm'r., 501 F. App'x. 24, 25 (2d Cir. 2012) (same). The Court finds no error on these grounds.

Finally, plaintiff argues that the ALJ's RFC "failed to include important vocationally relevant limitations set forth by Dr. Rahul S. Anand" [doc. #11 at 32]. These limitations included avoiding activities such as climbing ladders,  allowing plaintiff "to take breaks (5-6/day) and change position from sitting and standing" as well as "avoid[ing] activities such as climbing ladders, balancing, stooping, extending, and lifting." [Doc. #11 at 31; Tr. 463].  Because the ALJ failed to include these functional limitations, plaintiff argues that the ALJ's hypothetical to the vocational expert was "defective" because it

did not accurately portray the claimant's individual impairments. [Doc. #11 at 32]. The Court disagrees. The RFC determination was supported by the reports of two state agency reviewing physicians; plaintiff's own estimations of her functional abilities; the lack of significantly abnormal clinical and neurological findings; and plaintiff's activities of daily living.

The ALJ in fact assigned a more favorable RFC to plaintiff's disability claim than the two reports of the two state agency reviewing physicians, Doctors Rittner and Bennett. [tr. 57-64; 66-75]. As set forth above, Dr. Rittner's June 2011 assessment was discounted by the ALJ only because evidence that post-dates that report "show[ed] that the claimant [was] more limited." [Tr. 17]. With regard to Dr. Bennett's October 2011 report, the doctor made an RFC finding identical to the ALJ's eventual RFC determination, except that Dr. Bennett did not mention any need for a sit/stand option. [Tr. 71-73].

Even if the ALJ had had accepted Dr. Anand's proposal that plaintiff should avoid climbing ladders, balancing, and stooping, [tr. 463], the ALJ's ultimate Step Five conclusion would not have changed.  At Step Five the ALJ relied in part upon vocational expert testimony that a person with plaintiff's vocational profile and RFC could perform the jobs of assembler and machine tender. [Tr. 18]. According to the DOT, these jobs do not involve

64

any climbing or postural activities as such as balancing, stooping and the like. DOT #734-687-018, 1991 WL 679950; DOT #681.685-030, 1991 WL 678151. The vocational expert testified that both jobs are available in significant numbers in the national economy even with a sit-stand option. [Tr. 45-47]. "Even if the VE had identified only one job that existed in sufficient numbers, the Commissioner would have met his burden at the fifth step." Sullivan v. Astrue, No. 08-6355-CJS, 2009 WL 134 7035, at 15, n. 15 (W.D.N.Y. May 13, 2009) (citing cases including Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d. Cir. 1983).

The Court has already reviewed the evidence of record showing that plaintiff's estimations as to her functional abilities were largely consistent with the ALJ's RFC determination. With regard to her work as a hairdresser, plaintiff asserted she could not perform her job on a full time basis, [tr. 17, 32], and the ALJ agreed, concluding that Ms. Durante could only stand/walk up to four hours per day. [Tr. 14]. With regard to exertion, plaintiff testified that she could lift up to ten pounds, [tr. 37], and the ALJ agreed by limiting her to sedentary work, which by definition precludes lifting more than ten pounds. [Tr. 14, see 20 C.F.R. §404.1567(a)]. Plaintiff testified before the ALJ that she could sit for twenty to twenty-five minutes at a time and stand for fifteen to twenty minutes at

65

a time and walk up to twenty minutes at a time. [Tr. 37, 192],
and the ALJ effectively agreed, limiting her to work that allows
her to shift back and forth between sitting and standing every
fifteen minutes. [Tr. 15].  As set forth earlier in this opinion,
the ALJ did not adopt all of plaintiff's proposed limitations.
The Court's analysis is set forth in the arguments raised
addressing the ALJ's assessment of plaintiff's credibility.

Similarly, the Court already found there was substantial
evidence in the record to support the ALJ's finding that "the
lack of significantly abnormal clinical and neurological
findings" impacted the RFC determination. [Tr. 16]. The Court
will not repeat that analysis here.

Last, the ALJ properly considered the plaintiff's ADL's in
determining her RFC.  As previously discussed in this opinion,
plaintiff worked part-time approximately four hours a day, four
days a week, drove daily and grocery shopped during the
disability period. See Roma, 468 F. App'x. at 19; Michels, 297 F.
App'x. at 75-76.

On this record, the Court finds the ALJ did not err in
assessing plaintiff's RFC and there is substantial evidence in
the record to support his finding.

## IX.  CONCLUSION

For the reasons stated, Plaintiff's Motion for Order Reversing the Decision of the Commissioner **[Doc. #11]** is **DENIED.** Defendant's Motion for Order Affirming the Decision of the Commissioner **[Doc. #12]** is **GRANTED.**

In accordance with the Standing Order of Referral for Appeals of Social Security Administration Decisions dated September 30, 2011, the Clerk is directed to transfer this case to a District Judge for review of the Recommended Ruling and any objections thereto, and acceptance, rejection, or modification of the Recommended Ruling in whole or in part. See Fed. R. Civ. P. 72(b)(3) and D. Conn. Local Rule 72.1(C)(1) for Magistrate Judges.[11]

ENTERED at Bridgeport this 6th day of August 2014.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

---

[11] Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order. Failure to object within fourteen (14) days may preclude appellate review. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 72.2 of the Local Rules for United States Magistrates; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989)(per curiam); F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).